Good morning, your honors. Thank you for mentioning that. I know everyone here, his prayers are with all of the people who have been devastated by the fire. I'd like to reserve five minutes, if I may. May it please the court. I believe the underlying focus of the court down below was misplaced. The underlying focus of the medical bills. I believe what the focus should have been was what did GEICO already know? What could they have reasonably discovered if they had done an investigation over the year before the demand letter came in? And also what did they conclude before they got the demand letter? All of these are addressed in footnotes in the underlying opinion and not really fleshed out for the court. What did GEICO know? Well, they could have gotten an unredacted police report. They had a year to do that. They had every right to do it. They're insured has a duty to cooperate with them. She had a right to an unredacted police report. They could have gotten her to sign something to allow them to get it unredacted and they didn't. Had they obtained the unredacted police report, much like in the demand letter, they would have learned that it said major head injury. They failed to do that. Police report, if they had reviewed it closely, unconscious, not responsive, major injury, severe, pools of blood noted in the streets. They took their client's statements. They knew he was unresponsive at the scene and they knew liability was not a question. The GEICO note before they even took her statement was in early August, about a month after this accident. He was unresponsive at the scene and it was a possible fatality. Due to the severity of those injuries, what did GEICO do? They sent it to their continuing unit, which deals with their biggest damage cases, their most senior adjusters who understand litigation and understand damages. What does she do? In September 20th, about two months after this accident, she reviews the file and she calls Ms. Zavala, the insurer. We don't think you have enough. I have to send you an excess letter because you might be on the hook. She also assures her, as is her obligation, if we can get this settled within your policy limits, we will. Counsel, my personal experience is irrelevant, but I don't think I've ever seen an insurance case with major damages and injuries where the insurance company wasn't asking for medical bills. Is California, is there a standard practice of not asking for them if the damage numbers look really high? Was there any evidence of that below that you don't even need to ask, or if you don't get them, you can just pay without getting the medical bills? Is that a standard practice in California insurance adjudication? Your Honor, yes. I will also say that the issuance of CCP 999 shows that there were standards that were sort of loose, and the insurance industry understood, based upon their desire to have CCP 999 come into effect. And I will tell this Court, if you look into CCP 999, I was president-elect of the plaintiff's bar at that time, and I negotiated that. I was on the team that negotiated that. McGranahan was a case that I had in mind when we negotiated it. That is why says it's not retroactive. It goes forward and gives standards that now allow for and say you need to provide information. But it also says, because of McGranahan, that this doesn't apply to pro pers, because pro pers don't understand these things, Your Honor. So the law at that time was pre-CCP 999, was like Intigon. They would have and could have, if they knew and conclude the policy limit's not going to be enough, they need to pay. I'm sorry. Go ahead. I just wanted to make sure I answered Judge Bennett's question. You did. Thank you. Thank you, Your Honor. You mentioned the pro pers status, but at some point he got counsel, and counsel didn't provide the medical records. I'm having trouble understanding that. Can you speak to that at all? I can, Your Honor. They did come see me, as is in the brief, in April. I told them it was a slam dunk case. I told them to send a letter. I told them what to put in it. I told them to give a firm deadline. By the time they hired counsel, the deadline had passed. Their ability to settle that after the demand, after the extent of the date of pay by this date passed, it becomes irrelevant that now they have a lawyer and the lawyer gives them the medical bills, because if they offer it under California law, they've already expired their time. They don't have the ability now to go back and say, oh, by the way, even though we were supposed to pay by August 20th, it's now September 15th. We now have this information. We're going to offer it. They should have offered it before. The fact that a counsel comes in after the deadline of the demand under the cases, that's too late. I hate to use the term red herring, but it is a red herring to say, well, the demand's now expired. Now they got attorneys. Now we can offer it. It doesn't matter at that point. You're in litigation. You should have offered it before. Does that answer your question? I'm sorry. Judge Friedland, does that answer your question? I mean, it partly does, but it seems a little bit like game playing if the issue is when counsel was hired, because it seems like they had talked to counsel before the letter. I'm just still having trouble understanding if you were trying to set this up as a test case or what was going on. Why not send- No, Your Honor. I just don't understand why there wasn't either sending medical records or sending a signature that they could obtain the medical records. Well, Your Honor, as I indicated, and I think this gets a little beyond the record, when they came and saw me, I looked at the police report and said, this is a slam dunk. They need to pay you. But that was it. You don't need to pay me to go forward. That's a waste of money. Why am I going to take a percentage of this case? This is a slam dunk. Send a letter, put these types of things in it, and they're going to pay you. And if they don't, come back and see me. Because at that point, they're in bad faith. That was the meeting that they came and saw me. I literally said, you don't need me. They'll pay you. And if they don't, then come see me. And that's what happened. Counsel, it looks like with regard to the extensive medical bills that Medi-Cal cut them down like 80, 90 percent, something like that. And there are notes in the GEICO records that are part of the record that pre-paying, that said, you know, Medi-Cal typically cuts bills huge amounts. Is there any oral that that's true? That is true. And the adjuster knew that. When she talked to Ms. Porter, Ms. Porter said, we're applying for Medi-Cal. The adjuster knew it, Howard. So she knew, even without looking at the medical bills, that whatever the number was, the ultimate amount that your client was going to have to pay could be as much as a 90 percent reduction. She did know that. And, Your Honor, after she knew that, what did she write in the file? She wrote in the file these exact words. Policy limits are not going to be enough. The bills alone will likely be in excess of the policy limits. So she knew, by the way, she was no strategist because she is a senior adjuster. She knew the bills were going to be over 100, even with a Medi-Cal reduction. And they were 130 when they actually got them later. So she knew it was going to be above. But the key word here, Your Honor, is alone. The bills alone. When the demand letter came in, so she knew there was more that they were entitled to. When the demand letter came in, what does it say? It says, I will have significant future medical costs, future, as well as not be able to continue working at my own gardening and landscaping business. Now, with the police report, she can look at his age and figure if this is true, which, by the way, is 100% consistent with what she learned from this order, that my client's loss of earnings alone over a three-year period, if he just made $35,000, is going to be more than a $100,000 policy. This is why she You're looking at the letter starting at ER 173? I believe so, Your Honor, yes. Is there anything in there that even estimates what the loss of income is? Like, I make $10,000 a year, I make $30,000, I make $40,000. I've been out of work now for almost a year, and I've lost $20,000, $30,000, $40,000. Is there any number in there at all? No, Your Honor, but that is why the term, the medical bills alone, or the bills alone, because she knew the bills alone would be over $100,000, and they turned out to be $130,000, and she then knew when the demand letter came in that he wasn't able to work. So, adding those two together, she knew, based upon the severity of the head injury, that that was over their policy. And I believe I'm out of time unless the court has other questions. I do have one question. You've been saying $130,000, but I actually thought it was $323,000 approximately at ER 181, because that's the Medi-Cal lien amount. I was wondering if the $130,000 is the hospital, and then there's also some sort of rehabilitation bill? I'm sorry, I believe $130,000 was the hospital bill alone. The bills were much higher than that. They were, you're right. The hospital bill alone, which she knew when she talked to Ms. Porter, who's the girlfriend, she's demanding a girlfriend to turn in the medical records. She doesn't know whether the girlfriend stays with him. I thought it was interesting that under capital specialty, they elevated it to the policy limit might not be enough, because they've gone radio silent, and that guy didn't have a brain injury. In this case, my client has a brain injury, and they asked the girlfriend, who doesn't have the right under HIPAA laws to get this information, to provide it to him. I'm out of time. Any questions? I have a comment. Counsel? Yes. If you fully answered the questions that Judge Freeland asked you, and that Judge Bennett asked you, do you want to reserve the rest of your time for rebuttal? I do, Your Honor. Thank you. Okay. Then we'll proceed to hear from the appellee. Good morning, Your Honors. Arzu Jamshidi on behalf of Appellee and Defendant Geico Indemnity Company. Your Honors, the court did correctly focus its decision here by determining that despite all the evidence that plaintiff put forth, despite claiming that the insurer should have known the extent of the injuries, ultimately, there was absolutely no evidence put forth by plaintiff quantifying the plaintiff's injuries. And I think that's where the sticking point is here. And that is exactly what the case is, including capital specialty, even Entegon, and Sprodling, all say that the importance is how you can quantify the plaintiff's injuries. Counsel, let me just push back on that a little. Okay. The moment the adjuster got the redacted police report, they knew that the plaintiff had been very, very seriously injured. At ER 126, sometime after the accident, they knew he might have died, possible fatality. And I mean, just given the nature of the accident, that he was on a motorcycle, that he wasn't wearing a helmet, even with Prop 213, I'm having some difficulty understanding how a reasonable adjuster just immediately looking at this case wouldn't have said, our policy limit, even with 13 is 100, there is no possibility this case is going to come in at under 100. And so, I mean, I know it's routine to ask for medical records, it's routine to ask for economics, but the number compared to what they knew day one is so low, it's hard for me to see how the conclusion shouldn't have been immediately, I mean, putting aside just a minute bad faith, but the conclusion shouldn't have been immediately, we're never coming in under policy limits, given how injured this poor man was. Your Honor, the evidence actually shows, and I believe Judge Freeland touched upon this, you know, with the difference between the numbers of the 130 and the 320. And I think that difference is timing. So the 130 number was what they received in 2017, when they received, they finally received backup and corroborating evidence regarding the medical bills. And they received the medical records, it showed that even despite all of these injuries up until 2017, the lean was 130. So that's not that far off from the policy limits of 100, Your Honor. So it was reasonable for them to question at that point. But didn't the girlfriend fairly early on tell them how long he was in the hospital, he was in ICU, he was on a ventilator, I might be misremembering that, some sort of tracheotomy or tracheostomy, I may be misremembering that too. But very serious and even exclusive of this huge number from a hospital stay that Medi-Cal is going to really kick down. I mean, wouldn't they also be on notice that for injuries like this, the bills don't stop when he's discharged from the hospital after seven weeks or however many weeks it was? Your Honor, even if that was, again, the point is, is that even despite how serious these injuries were, they still hadn't received any corroborating evidence. And this is also... Sorry, corroborate, corroborate, I don't mean to interrupt, I'm sorry, but corroborating evidence of what? Of the quantification of plaintiff's injuries. And that's what the courts have emphasized numerous times. If you look at the Spradling case, Your Honor, they actually had a lot of information, a lot more information certainly than this case. The Spradling case, there was a lot of back and forth between plaintiff's counsel even, between plaintiffs and the insurer. I just need to interrupt you here because I'm struggling with the fact that the briefs mostly cite federal district court cases, and we're applying California law. So that district court case might have been wrong. I mean, unless you can cite a California case that has some facts like this, with this serious an injury, that shows that it's reasonable to keep insisting on for the medical bills instead of just making some assessment of what kind of bills there would be for such injuries. I don't know that citing district court cases is going to help you. So do you have any California cases that say this? Your Honor, no, I have not found any California cases, but we do have the statute. The statute that has actually been enacted and is now in full force, CCP 999. And I know that was mentioned by plaintiff's counsel. And in that case, they basically do say that there is a need for medical documentation and medical bills. It's not retroactive, right? So I mean, why would they make it not retroactive unless there was a change? Your Honor, I think this was the trend that the legislature wanted to go in, right? I know a lot of statutes that aren't retroactive, but this is now the law here in California. This is what they wanted. And so, and I know there was a mention about the 999 doesn't apply because the plaintiff wasn't represented by counsel, but that's not true. The plaintiff was- It doesn't apply because it's before the time of the enactment. I mean, it's before the date when the law went into effect is why it doesn't apply, right? That's correct. But there are no California cases also stating that they don't need medical, corroborating medical records. There's no- I guess I'm just looking at, so do you agree that the standard under Kransko, which is California Supreme Court, is that the insurer must settle within policy limits when there is a substantial likelihood of recovery in excess of those limits? Do you agree that's the test? We may have lost counsel. Yes, Judge, it appears we've lost counsel. Please stand by. Your Honor, we might want to note the time. Oh, sorry. I want to make sure she has her time. Counsel is returning. Please stand by. I sincerely apologize, Your Honor, as my computer just completely rebooted out of nowhere. I'm sorry, Judge Freeland, you were- I'll ask the question again. So, I understand, so Kransko is the California Supreme Court saying the standard is the insurer must settle within policy limits when there is a substantial likelihood of recovery in excess of those limits. Do you agree that's the standard? That is the standard, yes. Okay, and so this is a summary judgment case, so isn't the only question that we would need to decide whether a reasonable jury could think that on these facts the plaintiff might win? I mean, I don't even know that we need to say the plaintiff does win. For summary judgment, don't we just need to say there's a fact dispute here about whether there's a substantial- the insurer should have known that there's a substantial likelihood of recovery beyond the limits? Is that what we need to decide today? Your Honor, I think it's a little bit more nuanced than that. The standard also goes on further to say that in determining whether an insurer has acted unreasonably, whether the conduct actually has been deliberate, and then there's been a conscious and deliberate act. It can't just be based on an honest mistake or a bad judgment or negligence. There has to be something more deliberate there. But this was deliberate, right? I mean, is there any question that the- I mean, we know- could a jury looking at this record see what Ms. Porter said, what the police, even though it was redacted, said, and have a question about whether deliberately the insurer didn't pay, even though there was a substantial likelihood? I mean, I'm having trouble- I can see how a jury might rule for you ultimately, but I'm having trouble seeing how there isn't at least a fact dispute here. Your Honor, again, I think the important part is also time frame, right? So when you're looking at a bad faith case here and determining- especially when you're looking at a bad faith failure to settle, you have to look at the time that they were actually given that settlement demand, right? They were given that settlement demand. All the information they had were from non-corroborating sources, right? Yes, the police report said that there were severe injuries. It certainly didn't say- I know there was some mention about blood being on the ground. It certainly didn't mention any of that. That gets into- once you know- once the insurer knows as much as the insurer knew here, why not go out and try to get the information in some way other than calling the girlfriend? I mean, it seems like you could show up at the hospital and ask for the signature for getting the rest of the records or ask something about what's happening or try to see him and see if he's that badly injured. There are a lot of different things that could have been done once you have enough information to realize this could be very serious. I'm not understanding why that isn't- why the- from the fact that you didn't do that, the jury could infer that there was bad faith here. Your Honor, the standard for bad faith does not require the insurer to have a perfect investigation to do everything. It's a much more high degree standard here. It's not based on negligence. It's not based on a bad judgment. Even if it was a bad judgment that they didn't go to the hospital to get the signature, that's not what the standard is. It has to be a deliberate and conscious act. And the information here, even with the severe severity of the injuries, they would simply be speculating at this point how much- So, counsel, I'm looking at ER 133, which are some of the adjuster's notes, and September 2014, referencing a call with the girlfriend, and she says, he was in the hospital for seven weeks. He was then transferred to rehab. He's still there. He was in ICU for two of the seven weeks. He was on a ventilator, had a tracheostomy. He then got this MRSA, infection, severe head trauma, broken jaw, broken arms that required plates and screws. Is there anything in the record which suggests that GEICO had any reason to believe that what's in those notes was untrue as of September 22, 2014? Not necessarily, Your Honor, but to the extent that we can take everybody at their word, there wouldn't be any lawsuits. The insurer's not required to put- They're not supposed to put their interest above the insurer, but they're not also supposed to basically not have their own interest in mind. And I think it was completely reasonable for them to ask for any corroborating information here. That wasn't exactly my question. So, insurance companies often, when they suspect that they are hearing something that's untrue, they have various means to do things to take a quick look and see if something just doesn't smell right. Is there anything in the record here that suggested that vis-a-vis the severity of the injuries? I'm not talking about the numbers attached to them, but vis-a-vis the severity of the injuries as reflected in what the girlfriend said on or about September 22 was untrue or that they questioned the veracity of the girlfriend? There's nothing in the record, Your Honor, as to showing that the girlfriend's- the information that the girlfriend provided was untrue. But again, I would say that the insurer was completely reasonable in asking for that backup. I think that, again, I know that Judge Freeland was mentioning that we're relying on district court cases, but these district court cases do indicate that such information, even coming from a third party or a family member of the third party that was insured, wasn't enough. The court came out and said that's not corroborating evidence and that they can request that. And no matter how severe these injuries were, it was complete speculation to determine that this insured was going to obtain damages above 100, especially because this insured was a Prop 213. Those damages were very limited, and they knew that very, very early on in their investigation. And I would say that there is no responsibility on behalf of the insurer to settle a claim before it receives settlement demand. I think that- Counsel, Judge Gould, if I could interject. One question. Does a bad faith claim under California law require subjective bad faith or is there an objective standard? Your Honor, I believe it is an objective standard. Okay, thank you. Yes, Your Honor. So the, you know, I think the limitations here, I mean, they knew very early on. They didn't have to. I mean, they were trying to get this information from the insured from day one. And it looks like I've run out of time, Your Honors. If there's any other questions I may answer. Let me just ask this. I have no further questions, but do Judge Bennett or Judge Friedland have more questions they'd like to hear from the appellee? No. Thank you for asking, Judge Gould. Okay, well, hearing none, then I think we'll permit a brief rebuttal. Thank you, Your Honors. I believe the court has hit the nail on the head. This is a motion for summary judgment. Is there a question of fact? In an answer to Judge Bennett's question to counsel, in September, after the adjuster speaks to Ms. Porter, the following words are written in the claim file. Policy limits are not going to be enough. The bills alone will likely exceed the policy limits. That is a question of fact that they knew nine months before, and they were right because she's a senior adjuster. And a jury should be able to answer whether or not, based upon that note alone, they deliberately failed in their obligation to Ms. Zavala. Without further questions, I will rest. Thank you, counsel. Thank you, Your Honors. It's time. McGranahan v. Kalko shall now be submitted, and the parties will hear from the panel in due course. I want to also remark that we appreciated the excellent arguments on both sides of the case, and we again thank counsel in these excruciating times for making it possible to have an oral argument by video. So, thank you.
judges: GOULD, FRIEDLAND, BENNETT